## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

ANTWON G. WHITTEN,        )
                                    )

        Plaintiff,         )     Case No. 7:17CV00465
                                    )

v.                       )     **OPINION AND ORDER**
                                    )

ATIF ATYIA, ET AL.,         )     By: James P. Jones
                                    )     United States District Judge

        Defendants.     )

*Antwon G. Whitten, Pro Se Plaintiff; Margaret Hoehl O'Shea, Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants David Anderson, Leslie Fleming, J. B. Messer, and B. J. Ravizee; Jimmie C. Miller and James N. L. Humphreys, Hunter, Smith & Davis, LLP, Kingsport, Tennessee, for Defendant Atif Atyia, M.D.; Rebecca J. Ketchie and Andrew T. Wampler, Wilson Worley P.C., Kingsport, Tennessee, for Defendants Rebecca D. Kelly and Billie Cowden; Susan A. Waddell, Guynn & Waddell, P.C., Salem, Virginia, for Defendant Dr. Rose Dulaney.*

The plaintiff, Antwon G. Whitten, proceeding pro se, has sued several Virginia Department of Corrections ("VDOC") officials under 42 U.S.C. § 1983 for allegedly conspiring to infect him with Hepatitis C, in violation of his constitutional rights. After review of the record, I conclude that the defendants' motions for summary judgment must be granted.

# I. BACKGROUND.

## A. Whitten's Allegations.[1]

On the morning of October 31, 2015, when Whitten was incarcerated at Wallens Ridge State Prison, he and another inmate, C. Brown, had a fight inside a cell. While the inmates were fighting, Brown bit two of Whitten's fingers. A K-9 officer and his dog were involved in breaking up the fight, and the dog bit Whitten in several places.

Around noon, prison officials transported Whitten and Brown to the emergency room at Lonesome Pine Hospital in nearby Big Stone Gap, Virginia. Wallens Ridge Warden Fleming and Major Anderson were in the room while Atif Atyia, M.D., was treating Whitten. Nurse Rebecca D. Kelly was also present.[2] Whitten was the only African American male in the room.

> [W]hile [he was] on the emergency room table receiving sutures from [Dr.] Atyia, the conversation about how the Prison's dog mauled [him, Whitten] stated, "That dog needs to be euthanized." At that moment Warden Fleming, Major Anderson and [Dr.] Atyia all gave each other a look that said, "what [Whitten] said was somehow wrong

---

[1] Although Whitten filed a document entitled Amended Complaint, ECF No. 10-2, it did not offer a complete statement of his claims or the events on which they are based. Accordingly, the court recognized it as an amendment to the initial Complaint. In addition, Whitten has filed dozens of verified documents and declarations in this case, stating and restating his allegations and claims in various versions. I have reviewed and liberally construed them to compile this summary of the events he alleges.

[2] Nurse Kelly's last name is presently Gilly. To avoid confusion, however, I will refer to her as Nurse Kelly.

or disrespectful."[3]  Soon after as the doctor was doing the sutures, he claimed to have pricked his finger, he went to get a new glove and was followed out the room by both Defendants Fleming and Anderson.  Dr. Atyia returned and asked [Whitten] if [he] would take a Hepatitis test?  [Whitten] stated, "Yes."[4]

Compl. 3-4, ECF No. 1.  Lab Technician Billie Cowden then "entered the room and inserted a needle in [Whitten's] arm to draw blood."  Am. Compl. 2, ECF No. 10-2.

In the days after Whitten returned to Wallens Ridge, a nurse came to his cell on three occasions "and requested blood work but never told [him] the reason for it."  *Id.*  Dr. Dulaney, Whitten's treating physician, had access to his medical records and allegedly, "was totally aware that [he] did not have Hepatitis C or any other disease other than heart disease" before October 31, 2015.  *Id*. at 7.

"[Whitten] was transferred to Red Onion State Prison in February 2016 and days later on February 11th, 2016 Dr. Smith of ["Red Onion"] advised [Whitten] that [he] had (Hepatitis C).  Compl. 4, ECF No. 1.  Whitten filed an informal complaint and two regular grievances about Dr. Dulaney's failure to tell him about the blood tests or about his testing positive for Hepatitis C.  Whitten alleges that the grievance coordinators at Red Onion and Wallens Ridge, defendants J. B.

---

[3]  Elsewhere, Whitten states that his comment about euthanizing the dog "made defendants Atyia, Fleming and Anderson look at each other with a sinister look of disapproval."  Compl. Ex. U, Whitten Decl. 1, ECF No. 1-2.

[4]  Whitten apparently agreed to the blood test because he had heard rumors that Brown had Hepatitis B.  Compl. 4, ECF No. 1.

Messer and B. J. Ravizee, respectively, conspired to interfere with his ability to complete all levels of the grievance procedure.

## B. The Defendants' Evidence.

After the fight between Whitten and Brown on October 31, 2015, a Saturday morning, they were transported by ambulance to Lonesome Pine Hospital's emergency department, escorted by a sergeant and two correctional officers. Warden Fleming and Major Anderson, the duty officer for the day at Wallens Ridge, both drove separately to the hospital to speak to the inmates about the fight. These officials deny making any decisions about Whitten's medical care, conspiring with anyone to harm him, or discriminating against him for any reason, including his race. They also deny having had any reason to believe that anyone would, or did, intentionally infect Whitten with the hepatitis C virus on October 31, 2015.

Nurse Kelly, who had 23 years of medical experience, was working at the hospital on October 31, 2015. Her assignment was to assess patients in the emergency department and implement the doctors' orders. When Whitten arrived to be treated for injuries he had sustained during the prison altercation, Dr. Atyia was his attending physician, and Kelly was one of his nurses. Prison personnel were present with Whitten, but Kelly is not sure who they were.

Dr. Atyia, a native of Egypt, is a licensed physician with years of experience in the United States as an emergency and primary care physician. In October of 2015, Dr. Atyia was an independent contractor with Northeast Tennessee Emergency Physicians ("NTEP"), a professional corporation that had a staffing contract with the hospital to provide emergency medicine physicians. Under that contract, Dr. Atyia was working in the hospital's emergency department when prison officials brought Whitten there for treatment just after noon on October 31, 2015.

During the doctor's examination of Whitten, he noted his understanding that Whitten had been stabbed in his scalp, back, and left axilla during a fight with another inmate and that a guard dog deployed to stop the fight had bitten and scratched Whitten on his scalp, back, and left hand. Dr. Atyia

> administered a local anesthetic, Lidocaine. Plaintiff Whitten was prepped and draped in the usual sterile fashion and imaging was obtained to evaluate for foreign bodies. Plaintiff's wound areas were sterilized. [The doctor] treated lacerations of the left axilla, left hand, and left upper back, which required 28 sutures for repair. There were also two stabbing lacerations in the left axilla which required significant repair with internal sutures. There were multiple small lacerations on the left hand and some superficial lacerations and scratch marks on the upper left back, which required 12-15 internal sutures and 15 external sutures. The repaired areas were dressed with antibiotic ointment and adhesive bandages. Plaintiff Whitten was discharged with a prescription of Augmentin, an antibiotic.

Atyia Decl. ¶ 5, ECF No. 79.

While suturing Whitten's wounds, Dr. Atyia pricked his sterile glove and hand with the suture needle. Immediately, he stopped the treatment to clean and sterilize his hands and obtain a new pair of gloves. Dr. Atyia does not remember whether or not he left the treatment room to do so. He states that two prison officers were with Whitten during the treatment. Dr. Atyia did not know either of these officers and does not remember that they identified themselves. The doctor also had no relationship, contractual or otherwise, with VDOC. To the best of his knowledge, he also did not know Whitten and had not previously treated him.

Dr. Atyia does not recall Whitten making any comment about the prison dog. The doctor had little or no discussion of any kind with the prison officers. He specifically denies having any conversation with them about a conspiracy to harm Whitten or about Whitten's race, which was not mentioned.

Whitten gave his permission to have a blood sample taken to test for "HIV-1 RNA and Hepatitis B." *Id.* ¶ 8. Dr. Atyia ordered these tests in part out of concern for his own health. The doctor potentially had been exposed because Whitten had arrived covered with blood and because the doctor had pricked his finger through his glove while suturing him.

Billie Cowden, a phlebotomist for the hospital, received the order by Dr. Atyia to take Whitten's blood for testing. Cowden remembers that prison personnel were with Whitten while she was taking his blood, but she did not know

them. During the few moments she was in the treatment area, she followed her normal routine. She received Whitten's verbal consent to have his blood drawn, she took a new needle out of a sealed, sterile package, and she used that needle to draw Whitten's blood into a new, sterile vial. Cowden states that there was no chance for the needle to become contaminated before she used it to draw Whitten's blood. She also states that she did not perform any other procedure on him; did not use a dirty needle on him, or adulterate the needle or vial in any way; and did not take any action intended to infect him with Hepatitis C.

Dr. Atyia did not have Hepatitis C on October 31, 2015, nor does he have it now. He denies that he or anyone else at the hospital used a needle on Whitten that was infected with Hepatitis C, and states that the emergency department "do[es] not have dirty needles contaminated with Hepatitis laying around." *Id.*

The results of Whitten's blood test were not available at the time prison officials transported him from the hospital back to the prison. The hospital medical records reflect that Nurse Kelly tried to call the Wallens Ridge medical staff to speak with a nurse there about discharge instructions for Whitten's care and left a message. Specifically, Whitten was advised to follow-up with his primary care doctor as soon as possible and to return to the emergency department if conditions worsened or did not improve. Dr. Atyia provided no further treatment to Whitten after October 31, 2015.

Dr. Rose Dulaney was one of the prison physicians at Wallens Ridge in the fall of 2015. Medical records reflect that she saw Whitten on September 28, 2015, "for follow up of a prior cardiac workup." Mem. Supp. Mot. Summ. J., Dulaney Decl. ¶ 3, ECF No. 100-1. That day, the doctor checked his liver enzymes level on the report and saw that they were elevated. Dr. Dulaney states, "This is a non-specific laboratory result, which can be caused by many things, not all of which are serious." *Id.* After Whitten refused "an MD call" on October 5, 2015, "[b]ecause of his recently reported elevated liver enzymes," Dr. Dulaney "ordered a hepatitis C panel." *Id.* ¶ 4. The test results were negative for Hepatitis C.

After the fight between Whitten and Brown on October 31, 2015, Dr. Dulaney saw Whitten on November 2, 9, and 30, and on December 9, 2015, for treatment of dog bites to his axilla, back, and arm. She also scheduled a chronic illness visit with Whitten for January 6, 2016, to check on his chronic conditions of hypertension and hyperlipidemia, but Whitten refused that visit. Nevertheless, Dr. Dulaney ordered that Whitten's blood be drawn for repeat laboratory testing. These test results, received on or about January 13, 2016, showed elevated liver enzymes. Dr. Dulaney ordered that the enzyme levels be checked again in one month. That recheck of Whitten's liver enzyme levels was conducted on January 28, 2016.

Dr. Dulaney reviewed Whitten's medical chart on February 3, 2016, and saw that the laboratory results once again showed that his liver enzymes were elevated. As a result, Dr. Dulaney ordered a hepatitis panel. A nurse drew blood for that test later that night. Dr. Dulaney did not receive the results of that hepatitis panel because Whitten was transferred from Wallens Ridge to Red Onion on February 6, 2016. Medical records indicate that the results of the February 2016 hepatitis panel were reported to prison doctor Smith at Red Onion on February 9, 2016. Dr. Dulaney states that she was not aware during her treatment of Whitten that he had Hepatitis C.

## C. The Claims and Motions.

In his Complaint as amended, Whitten names the following defendants: Fleming, Anderson, Dr. Atyia, Cowden, Nurse Kelly, Dr. Dulaney, Messer, and Ravizee. Liberally construed, Whitten's submissions allege the following claims: (1) the defendants conspired to infect Whitten with Hepatitis C on October 31, 2015, because of his race and his comment that the prison dog should be euthanized, and to cover up that unconstitutional act by not revealing his condition or by impeding his grievances, in violation of the Eighth and Fourteenth Amendments;[5] (2) Dr. Atyia and Cowden committed medical malpractice on

---

[5] Whitten asserts his constitutional claims under 42 U.S.C. § 1983 and his conspiracy claims under that statute, as well as 42 U.S.C. § 1985(3). He also alleges that various defendants conspired to violate his constitutional rights in violation of 18 U.S.C.

October 31, 2015; (3) Dr. Dulaney was deliberately indifferent to a serious medical need and was negligent, by failing to inform Whitten of his Hepatitis C or treat him for it while he was at Wallens Ridge; (4) defendants Messer and Ravizee violated grievance procedure provisions, thus depriving Whitten of due process; and (5) various defendants committed other violations of state law. As relief, Whitten seeks declaratory relief, compensatory and punitive damages, and injunctive relief providing that he be transferred to a prison out of this region.

The defendants have filed motions for summary judgment supported by affidavits or declarations.[6] Among other things, they all deny that they harmed Whitten by infecting him with Hepatitis C, by knowingly allowing anyone else to do so, or by covering up the infection in any way. All of the defendants, except for Dr. Atyia and Dr. Dulaney, have asserted as an affirmative defense that Whitten's claims against them are barred because he failed to exhaust administrative remedies before filing this lawsuit. *See* 42 U.S.C. § 1997e(a). Whitten has

---

§ 241. A private citizen cannot file claims under this criminal statute. *See, e.g., El-Bey v. Rogalski*, No. GJH-14-3784, 2015 WL 1393580, at *3 (D. Md. Mar. 24, 2015) (noting that 18 U.S.C. § 241 is a criminal statute and "therefore provide[s] for no private right of action").

[6] The court docketed one of Whitten's responses to the defendants' motions as his Motion for Summary Judgment, ECF No. 91. He never argues, however, that no material facts remain in dispute or that I should grant summary judgment in his favor. Therefore, I construe the pleading as a response to the defendants' motions.

engaged in discovery and has responded to the defendants' motions.  After review

of the record, I conclude that these motions are ripe for disposition.[7]

## II. Discussion.

### A.  Summary Judgment Standard.

A court should grant summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  In short, a motion for summary judgment should be granted when the

proof, taken in the form admissible at trial, would lead a reasonable juror to but

one conclusion.  *Id.* at 247-52.  I must view the record as a whole and draw all

*reasonable* inferences from the facts in the light most favorable to Whitten, as the

---

[7]    Dr. Atyia moved for summary judgment on several grounds, including his contention that he was not acting under color of state law for purposes of 42 U.S.C. §§ 1983 or 1985 when he treated Whitten on October 31, 2015.  The magistrate judge granted Dr. Atyia's motion seeking a stay of discovery until I had addressed his motion. Whitten has not demonstrated that his ability to respond fully to the defendants' motions was hampered in any way because he did not receive particular discovery information from Dr. Atyia.  Furthermore, I have reviewed Whitten's discovery requests, ECF Nos. 47, 48, 53, 72-6, and 77.  The information he sought through these requests has either been provided to him by other means or is not directed toward proving the crux of his claims in this case, namely, how he contracted Hepatitis C.

nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).[8] To survive summary judgment, Whitten must present sufficient evidence that could carry the burden of proof on each element of his claims at trial. *Id.* "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992).

### B. Exhaustion of Administrative Remedies.

The Prison Litigation Reform Act provides that a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. 42 U.S.C. § 1997e(a). This exhaustion requirement is "mandatory," *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016), and "applies to all inmate suits about prison life." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must properly follow each step of the established grievance procedure that the facility provides to prisoners and meet all deadlines within that procedure. *See Woodford v. Ngo*, 548 U.S. 81, 90-94 (2006).

Defendants Fleming, Anderson, Ravizee, Mullins, Cowden, and Nurse Kelly have asserted that Whitten's claims against them are barred because he failed to properly exhaust administrative remedies before filing this action, as required by 42 U.S.C. § 1997e(a). Messer and Ravizee have presented affidavits in support of this contention.

---

[8] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

Operating Procedure ("OP") 866.1 is the written administrative remedies procedure that VDOC inmates must follow to comply with § 1997e(a). Mem. Supp. Mot. Summ. J., Messer Aff. ¶¶ 5-8 and Enclosure A, ECF No. 106-3. Under this procedure, an inmate with a grievance about some event or issue must first make a good faith effort to resolve his concerns informally, which he does by completing an Informal Complaint form and submitting it to prison staff. A staff member at the facility should provide the inmate with a written response on the bottom of the Informal Complaint form within 15 days. The inmate, however, is responsible for filing this form in a timely manner so that he can receive that staff response and attach the form to a Regular Grievance to initiate the formal grievance procedure within thirty days after the incident at issue. "If 15 calendar days have expired from the date the *Informal Complaint* was logged without the offender receiving a response, the offender may submit a *Grievance* on the issue and attach the *Informal Complaint* receipt as documentation of the attempt to resolve the issue informally." OP 866.1(V)(B)(2).

A Regular Grievance must be filed within 30 days of the occurrence about which it complains. Normally, "[i]nformal complaints must be addressed at the facility level and may not be referred to departments outside the facility." OP 866.1(V)(D). "If the offender has been transferred [since the event he is grieving], the offender should submit the informal complaint and subsequent grievance to the

facility where the issue originated." OP 866.1(VI)(A)(2)(b)(i). When a transferred inmate is indigent, the grievance coordinator "will forward the informal complaint and subsequent grievance to the facility where the issue originated." OP 866.1(VI)(A)(2)(b)(ii).

After investigation of a properly filed Regular Grievance, the warden or his designee will send the inmate a Level I response. If the responding official determines the grievance to be unfounded, the inmate must appeal that holding to Level II, the regional administrator, and in some cases, to Level III, to satisfy the exhaustion requirement.

> If a Regular Grievance does not meet the criteria for acceptance and review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with the criteria for acceptance. *The exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance process and appealed through the highest eligible level without satisfactory resolution of the issue.*

OP 866.1(IV)(O)(2)(b) (emphasis added).

The record evidence indicates that Whitten learned from Dr. Smith at Red Onion on February 11, 2016, that he had Hepatitis C. On February 18, 2016, Whitten filed an Informal Complaint, asserting that Dr. Dulaney had known, but had never told him while he was at Wallens Ridge, that he had contracted Hepatitis C, and "simply transferred [him]." Compl. Ex. L, ECF No. 1-1. Nurse Phipps at Red Onion wrote a response, dated March 1, 2016, stating, "I understand what you

are saying but the results had to be confirmed before you were told. The [V]DOC transferred you, the [doctor] had nothing to do with that." *Id.* Whitten did not receive this response within the 15-day deadline.

On March 16, 2016, Whitten filed his first Regular Grievance about Dulaney's failure to tell him that he had Hepatitis C. He explained that he had not received a timely Informal Complaint response and was attaching the receipt instead. Messer returned the Regular Grievance to Whitten on March 22, 2016, and directed him to "[a]ttach informal & resubmit for intake review." Mem. Supp. Mot. Summ. J., Messer Aff. Enclosure B, ECF No. 106-3.

Whitten submitted a second Regular Grievance about Dr. Dulaney, dated March 23, 2016. Messer rejected it because it was untimely filed and concerned events at a different prison, Wallens Ridge. Messer Aff. Enclosure C, ECF No. 106-3. On April 4, 2016, Ravizee at Wallens Ridge received a Regular Grievance from Whitten, dated March 23, 2016, complaining about Dr. Dulaney failing to inform him about his Hepatitis C. Ravizee rejected this Regular Grievance at intake as untimely filed. Mem. Supp. Mot. Summ. J., Ravizee Aff., Enclosure C, ECF No. 106-4.

The defendants bear the burden of asserting and proving the affirmative defense that Whitten failed to properly exhaust available administrative remedies regarding his claims before filing suit. *See Jones v. Bock*, 549 U.S. 199, 216

(2007). It is undisputed that Whitten did not file a Regular Grievance within 30 days of February 11, 2016, the date when he learned of his Hepatitis C diagnosis. This event triggered the timeline under OP 866.1 for Whitten to utilize administrative remedies to address his grievances. The Regular Grievances Whitten submitted at Red Onion about Dr. Dulaney, however, were filed on March 16 and 23, 2016 — 34 and 41 days after February 11, 2016. The Regular Grievance he submitted to Wallens Ridge was filed on April 4, 2016, 53 days after the event of which it complained. Thus, all of the Regular Grievances Whitten filed about contracting Hepatitis C were untimely, and thus not properly filed. It is also undisputed that Whitten never filed a Regular Grievance at either prison asserting that any group of individuals conspired to purposefully infect him with Hepatitis C.

Given this evidence, with no material fact in dispute, I find that Whitten did not properly file a Regular Grievance in compliance with OP 866.1 within 30 days after the February 11, 2016, incident that triggered his claims about contracting Hepatitis C. On summary judgment, an inmate may escape having his claims barred under § 1997e(a) for failure to exhaust administrative remedies if he states facts showing that the remedies under the established grievance procedure were not "available" to him. *Ross*, 136 S. Ct. at 1859 (noting that circumstances making prison grievance procedures unavailable "will not often arise"). Generally, "an

administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

Whitten makes no such showing. The procedure clearly states that Informal Complaints and Regular Grievances about events at another prison facility should be submitted to that facility within the applicable filing deadlines, rather than to the prison where the inmate is currently confined. Whitten failed to follow this procedure. He did not file his Informal Complaint at Wallens Ridge, and he did not file any timely Regular Grievance. Whitten seeks to blame Messer for failing to forward his Informal Complaint to Wallens Ridge. It is evident from the record, however, that an inmate's medical records accompany him when he is transferred. Thus, Red Onion medical staff would have been questioned about Whitten's medical complaints, no matter where the Informal Complaint was submitted. Moreover, Messer's alleged misdirection of the document did not prevent Whitten from receiving a response (albeit not a timely one) or from filing his Regular Grievance by March 12, 2016 — within 30 days after February 11, 2016. He failed to do so. Whitten offers no excuse for failing to file a timely Regular Grievance asserting his contention that Wallens Ridge and hospital personnel conspired to infect him with Hepatitis C on October 31, 2015.

For the stated reasons, I find no material disputed fact on which Whitten could prove that he properly exhausted administrative remedies or that those remedies were unavailable to him in any respect. Accordingly, he is barred under § 1997e(a) from pursuing his claims against defendants Fleming, Anderson, Messer, Ravizee, Kelly, and Cowden.[9] I will grant their motions for summary judgment on that ground. Because the timelines in OP 866.1 have long since expired, I find no indication that Whitten could now exhaust administrative remedies on these claims. Therefore, I will dismiss the claims with prejudice.

## C. State Action.

To state a cause of action under 42 U.S.C. § 1983, Whitten must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). A

---

[9] The record does not reflect whether or not Whitten exhausted administrative remedies as to his claims that Messer and Ravizee hampered his ability to utilize the grievance procedures. I find no evidence that they did so, however. Moreover, Whitten's claims that these defendants violated the grievance procedures do not give rise to any viable constitutional claim. Allegations that state officials have not followed their own policies or procedures do not amount to any constitutional violations, and, therefore, they are not actionable under § 1983. *See United States v. Caceres*, 440 U.S. 741, 752-55 (1979); *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990). In addition, "inmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). Accordingly, the defendants are entitled to summary judgment regarding any allegation that they did not comply with a prison policy provision or interfered with Whitten's ability to utilize the grievance procedure.

person acting under color of state law "must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that the non-state actor is engaged in the state's actions." *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir. 1999).

One circumstance when a private party will be deemed a state actor is "when the state has delegated a traditionally and exclusively public function to a private actor." *Id.* at 507. "[T]he provision of medical services to prison inmates is traditionally the exclusive prerogative of the state," because the Eighth Amendment requires the state "to provide adequate medical care to its prisoners because prisoners, due to their incarceration, cannot obtain medical care on their own." *Conner v. Donnelly*, 42 F.3d 220, 224 (4th Cir. 1994). "Regardless of the physician's employment relationship with the state, any physician authorized by the state to provide medical care to a prisoner exercises power that is traditionally the exclusive prerogative of the state." *Id.* at 225.

It is well established that a state-employed physician who provides medical services to inmates is a state actor, whether he works directly for the state or under contract. *West*, 487 U.S. at 54-55. Similarly, when the state authorizes an independent physician to provide an inmate with medical care, that physician "acts under color of state law even though there was no contractual relationship between the prison and the physician." *Conner*, 42 F.3d at 223 (holding that a private

physician specializing in orthopedic medicine acted under color of state law when he saw and treated an inmate four times at his private office on referral from a prison doctor). In such a situation, the physician "assumes the state's constitutional obligation to provide medical care to its prisoners" and thus "exercises power that is traditionally the exclusive prerogative of the state." *Id.* at 224-25; *see also Hixson v. Hutcheson*, Nos. 5:17-CV-00032, 5:18-CV-00001, 2018 WL 3715763, at *4 (W.D. Va. Aug. 3, 2018) (holding that nurses employed by a regional health care provider and assigned to provide medical care to jail inmates were state actors for purposes of § 1983).

Dr. Atyia claims that he was not acting under color of state law when he treated Whitten and, therefore, is not subject to Whitten's claims under § 1983. Dr. Atyia relies on his employment status as an independent contractor with private corporation NTEP which has a staffing contract with various hospitals to provide emergency room physicians. I find no merit to this argument. When Dr. Atyia provided treatment to Whitten, he "assume[d] the state's constitutional obligation to provide medical care to its prisoners" and thereby "exercise[d] power that is traditionally the exclusive prerogative of the state." *Conner*, 42 F.3d at 224-25. In so doing, Dr. Atyia acted under color of state law for purposes of §§ 1983 and 1985. Therefore, I cannot grant Dr. Atyia's Motion for Summary Judgment on the

ground that he is not a state actor.  I will, however, grant his motion on alternative

grounds.

### D.  The Eighth Amendment Claims.

To state a cause of action under §1983, Whitten must establish that he has

been deprived of rights guaranteed by the Constitution or laws of the United

States and that this deprivation resulted from conduct committed by a person

acting under color of state law.  *West*, 487 U.S. at 48.  The Eighth Amendment's

prohibition against cruel and unusual punishment imposes on prison officials an

"obligat[ion] to take reasonable measures to guarantee inmate safety."  *Makdessi*

*v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015).  Similarly, a prisoner has an Eighth

Amendment right to the medical care necessary to address his serious medical

needs.  *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  Not every harm that

an inmate suffers while in prison related to hazardous conditions or medical

needs, however, "translates into constitutional liability for prison officials

responsible for the [inmate's] safety."  *Makdessi*, 789 F.3d at 133.

When the inmate alleges that the defendants exposed him to a hazardous

living condition, he must show, objectively, that the allegedly hazardous condition

he identifies *caused* him a serious injury.  *Strickler v. Waters*, 989 F.2d 1375,

1380-1381 (4th Cir. 1993).  If his claim is that the defendant failed to protect him

from the condition that caused him injury, he must also show that, subjectively, the

official had a "sufficiently culpable state of mind to be held liable," namely, "deliberate indifference." *Makdessi*, 789 F.3d at 133. To be deliberately indifferent, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Similarly, where an inmate claims a constitutional violation related to medical care, he must show that the defendant "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

1. Dr. Atyia.

Whitten alleges that Dr. Atyia and the others in the treatment room with him on October 31, 2015, plotted to have Cowden use a needle to take blood from Whitten that had been somehow purposely infected with Hepatitis C; the dirty needle caused Whitten to contract the disease; and Dr. Dulaney, Messer, and Ravizee covered up the plot by failing to tell Whitten about, or treat him for, the disease, or by delaying his grievance forms. In response to the defendants' summary judgment motions, Whitten offers various verified pleadings and exhibits that allegedly support this alleged sequence of events.

A test of Whitten's blood at Wallens Ridge in mid-October of 2015 was negative for Hepatitis C. On October 31, 2015, while suturing Whitten's dog bite

wounds, Dr. Atyia pricked his finger and glove and left the room with Fleming and Anderson, all of whom exchanged a "look" that Whitten interpreted as sinister. When Dr. Atyia returned, Whitten consented to a blood test for HIV and Hepatitis B. Cowden came in shortly, unwrapped a needle, and took a blood sample from Whitten that was sent to a laboratory for testing.

The results of that blood test were negative for Hepatitis B. In January of 2016, at Wallens Ridge, Dr. Dulaney ordered two blood tests for Whitten, both of which showed elevated liver enzymes. On February 3, at the doctor's order, a nurse took blood from Whitten for a laboratory test for Hepatitis C. On February 9, 2016, after Whitten had arrived at Red Onion, Dr. Smith received the blood test results, and two days later, on February 11, 2016, Whitten learned that he had contracted Hepatitis C.

From these facts, Whitten has inferred that "[t]here is no other explanation for [his infection with Hepatitis C], other than [he] was intentionally infected or a dirty needle was intentionally used on [him]. Compl. 4, ECF No. 1. The defendants have offered evidence, however, that Dr. Atyia does not have Hepatitis C, that Cowden used a newly unpackaged needle to take Whitten's blood on October 31, 2015, and that the hospital's emergency department does not have a stockpile of Hepatitis C-infected needles to draw from at the whim of instant coconspirators. Moreover, all of the defendants have denied knowledge

that the needle Cowden used was infected with Hepatitis C or having any joint purpose with anyone else to infect Whitten because he was black and wanted a dog euthanized for biting him.

Taken as a whole, the evidence does not support a reasonable inference that Whitten contracted Hepatitis C through Cowden's needle while she was taking his blood for testing on October 31, 2015. At the most, Whitten's facts present merely a coincidence — the close timing between that blood draw and the positive Hepatitis C test result received just three months later. Whitten has not presented any facts eliminating other means by which he could have contracted the virus, such as through an unsanitary needle used for tattooing or during some other, earlier incident when he somehow came in contact with an infected inmate's blood. He fails to offer any evidence concerning how long the Hepatitis C virus might have been present in his body before a blood test would reflect a positive result. He presents no evidence concerning how Cowden or any of the other defendants might have obtained a needle bearing the virus and wrapped in the sterile package that Cowden removed it from before drawing his blood.

Moreover, Whitten presents no facts supporting a reasonable inference that Dr. Atyia knew on October 31, 2015, that the needle Cowden used to draw Whitten's blood presented a substantial risk of serious harm to the inmate and failed to prevent that harm. Nor do I find evidence in the record supporting a

conclusion that Dr. Atyia ordered Cowden to inflict such harm. Whitten cannot carry his case past summary judgment based merely on the coincidental timing of his Hepatitis C diagnosis and his self-serving, speculative interpretation of a glance between strangers as threatening to his health. *Baber*, 977 F.2d at 874-75 ("[U]nsupported speculation is not sufficient to defeat a summary judgment motion."); s*ee also Hoffman v. Tuten*, 446 F. Supp. 2d 455, 456, 471 (D.S.C. 2006) (finding plaintiff inmate's claim that a defendant's use of an unsanitary syringe was "the only possible way he could have contracted Hepatitis C" constituted "bald allegations" insufficient to show defendants were deliberately indifferent to his health). Thus, I cannot find that Whitten has presented any material fact on which he could persuade a jury that he was infected with Hepatitis C on October 31, 2015, at Dr. Atyia's behest in the manner he has claimed. I will, therefore, grant the doctor's motion as to Whitten's Eighth Amendment claims.

2. Dr. Dulaney.

Dr. Dulaney has filed a Motion to Dismiss or in the Alternative for Summary Judgment. Because the factual record has been fully developed, I will grant summary judgment in her favor.

Whitten's Amended Complaint contends that Dr. Dulaney furthered the other defendants' conspiracy "indirect[ly]," becoming "involved by her silence."

Am. Compl. 7, ECF No. 10-2.  Liberally construed, he claims that Dr. Dulaney knew from his blood test results after October 31, 2015, that he had contracted Hepatitis C, but did not tell or treat him.  Whitten contends that these actions or omissions constitute "deliberate indifference to a . . . serious medical need."  *Id.*

To satisfy the subjective inquiry of a deliberate indifference claim, the plaintiff must show that the public official "knows of and disregards an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837.  On the other hand, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  Thus, to survive summary judgment, Whitten must present evidence showing more than a "mere error of judgment or inadvertent failure to provide medical care, or [his own] mere disagreement concerning questions of medical judgment."  *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished).

Whitten fails to present facts showing that Dr. Dulaney was deliberately indifferent to his serious medical needs related to Hepatitis C.  The uncontroverted evidence is that she monitored his liver enzyme levels for weeks at Wallens Ridge, in addition to tracking and treating his cardiac issues.  He complains that she did not tell him, after these levels drastically increased, that he had the virus.  Dr.

Dulaney states, however, that increased enzyme levels may indicate conditions much less serious than Hepatitis C, and Whitten fails to contradict this opinion with any other medical expert's information. Dr. Dulaney made a medical judgment to perform a blood test specifically for Hepatitis C and wait for the results before telling Whitten or treating him for a virus that he might not yet have contracted. Whitten's apparent disagreement with this medical judgment is simply not sufficient to support a deliberate indifference claim. Therefore, I will grant Dr. Dulaney's Motion for Summary Judgment as to all Whitten's Eighth Amendment claims against her.

### E. Other Federal Claims.

Whitten claims that by allegedly conspiring to infect him with Hepatitis C, the defendants treated him differently than other inmates because of his race. "A claim of racial discrimination is a grievous charge, which certainly can rise to constitutional dimensions," implicating the Equal Protection Clause of the Fourteenth Amendment. *Chapman v. Reynolds*, 378 F. Supp. 1137, 1140 (W.D. Va. 1974). "[A]bsent some factual evidence the court will not look behind the determinations of prison officials on mere accusations that they are racially motivated." *Id.* Thus, merely conclusory allegations of discrimination based on race, such as Whitten has assserted, are insufficient to state a Fourteenth

Amendment claim. All of the defendants are, therefore, entitled to judgment as a matter of law as to any such claims.

Additionally, Whitten contends that the defendants, including Dr. Atyia and Dr. Dulaney, conspired to deprive him of civil rights and lodges a claim against them under 42 U.S.C. § 1985(3). To state a claim under this section, a plaintiff must establish the following four elements:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). Moreover, a plaintiff must show an agreement or a "meeting of the minds" by defendants to violate the claimant's constitutional rights. *Id.* at 1377. Conclusory allegations of a conspiracy are insufficient to state a claim. *Id.*

As already discussed, Whitten has offered no more than his speculation about the defendants' facial expressions to support his claims that the defendants conspired to harm him. Similarly, he offers no factual support for his claim that they did so based on his skin color. More importantly, Whitten has not presented any material fact on which he could prove that any act or omission by any of the defendants caused him injury, as required under *Simmons* and § 1985(3).

Accordingly, I will grant the defendants' motions as to Whitten's § 1985(3) claims.

## F.  The State Law Claims.

For the reasons discussed, I will dismiss or grant summary judgment as to all of Whitten's federal claims against the defendants. I decline to exercise supplemental jurisdiction over any of his state law claims, pursuant to 28 U.S.C. § 1367(c), and will dismiss them without prejudice.

## III.  CONCLUSION.

For the reasons stated in the Opinion, it is **ORDERED** as follows:

1.   Plaintiff's pleading at ECF No. 91, is CONSTRUED as a Response to Defendants' Motions, and the clerk will CORRECT the docket accordingly;

2.   The motions for summary judgment by defendants Fleming, Anderson, Messer, Ravizee, Cowden, Kelly, Dulaney, and Atyia, ECF Nos. 38, 78, 83, and 105, are GRANTED and the plaintiff's federal claims are hereby DISMISSED WITH PREJUDICE; and

3.   All state law claims are hereby DISMISSED WITHOUT PREJUDICE, pursuant to 28 U.S.C. § 1367(c).

A separate Judgment will be entered herewith.

ENTER:   March 29, 2019

/s/  JAMES P. JONES
United States District Judge